Filed 12/16/22  In re M.O. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.O. et al., Persons Coming Under the Juvenile Court Law. | D080423 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. J520740A-B) |
| v. | |
| N.O., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Conditionally reversed and remanded with directions.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia Silva, Acting County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

N.O. (Mother) appeals orders issued at a Welfare and Institutions Code[1] section 366.21 six-month review hearing in the section 300 dependency proceedings pertaining to her sons M.O. and T.O. (collectively referred to as the children). The juvenile court found, by a preponderance of the evidence that the return of the children to Mother would create a substantial risk of detriment to the children's physical or emotional well-being. Mother argues the court misunderstood section 366.21, subdivision (e)(1) and erred in continuing the children's foster care placement based on the court's statement that they would not be "completely safe" in Mother's custody. Alternatively, Mother argues substantial evidence does not support the court's detriment finding. Finally, Mother argues the requirements under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) were not satisfied.

We conclude the juvenile court properly applied section 366.21, subdivision (e)(1) and substantial evidence supports the juvenile court's detriment finding. However, because the San Diego County Health and Human Services Agency (the Agency) failed to comply with its inquiry obligations under ICWA, we conditionally reverse the juvenile court's order and remand for the limited purpose of ensuring ICWA compliance.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2021, the Agency petitioned the juvenile court under section 300, subdivisions (b) on behalf of the children, alleging the children suffered

---

[1] All further section references are to the Welfare and Institutions Code, unless otherwise indicated.

2

or there is substantial risk the children will suffer serious physical harm or illness due to their parent's failure or inability to supervise or protect them and their parent's inability to provide regular care for them due to the parent's mental illness, developmental illness, developmental disability or substance abuse. The Agency alleged that on April 19, 2021, the children tested positive for amphetamine, methamphetamine, and buprenorphine. Further, on April 18, 2021, Mother tested positive for amphetamine and methamphetamine and admitted using drugs during pregnancy. The Agency also alleged that father A.T. (Father)[2] denied a history of drug usage but has a criminal history related to drug and paraphernalia possession.

In its detention report, the Agency reported that Mother admitted she had substance abuse issues in the past and successfully completed inpatient treatment at McAlister Inpatient Treatment (McAlister) in 2020 and was transitioned to a sober living facility following her discharge. According to Mother, she remained sober from methamphetamine since her discharge, however, when she left the sober living facility she relapsed while living with Father. Mother stated she discovered she was pregnant at six weeks and refrained from using methamphetamine until she had a relapse approximately one week prior to the children's birth. She also admitted snorting Adderall during that time.

At the detention hearing, the juvenile court found the Agency had made a prima facie showing that the children were persons described by section 300, subdivision (b), and ordered them detained. The court directed services be provided and allowed for liberal visitation.

In its May 27, 2021 jurisdiction and disposition report, the Agency reported that on May 14, 2021, Mother expressed her preference for an

_____

2    Father is not a party to this appeal.

outpatient program but signed up for an inpatient program at McAlister, which would begin the following week. On May 24, 2021, Mother stated she was shocked that she tested positive for drugs and denied using drugs during her pregnancy. She claimed that her last use of methamphetamine was approximately three years ago and disputed the detention report, claiming that she never told anyone she used drugs. Mother stated she was still willing to go into drug treatment "to make the [c]ourt happy." The Agency expressed concern that Mother was not telling the truth about her current substance use and history.

In its July 27, 2021 addendum report, the Agency reported that Mother stated on June 1, 2021 that she did not enroll in the inpatient program because it was too far, and she would be signing up for outpatient treatment at McAlister. On June 22, 2021, Mother informed the Agency that she wanted to do treatment through Sharp Mesa and that she had been "clean" from "narco" for two weeks. On June 23, 2021, Mother informed the Agency that she was starting an inpatient program at Sharp Mesa that day. On July 14, 2021, Mother informed the Agency that she had not yet started any treatment program, she relapsed three weeks ago on "narco," she "sniffed meth" within the last month, and she expressed remorse but did not think her problem is drugs.

At the contested adjudication and disposition hearing on August 3, 2021, the Agency argued that it is "clear that the children were exposed to methamphetamine in utero. Although how much methamphetamine Mother was using during the children's birth, that story has changed. The positive tests and her clear statements that she was using show some level of addiction to methamphetamine. ¶ And, additionally, she hasn't been able to put herself in a position where she's benefited from drug treatment here

4

today." Mother's counsel indicated Mother was currently signed up for outpatient treatment at McAlister. She also had the option of doing inpatient at Sharp Mesa and after a week, Sharp would send her to a program based on her needs. Counsel represented Mother was making "active efforts to get into treatment." The court found, by clear and convincing evidence that the allegations in the petition were true and that the children are persons described by section 300, subdivision (b). The court declared the children dependents, removed them from Mother's custody under section 361, subdivision (c)(1), and ordered the children be continued to be placed in a foster home.

In its January 31, 2022 status review report, the Agency reported that Mother was residing in a sober living program. The Agency also reported that Mother initially began treatment with KIVA Residential Substance Abuse Treatment (KIVA) in September 2021, however, the Agency was informed on October 13, 2021 that Mother was placed on behavioral contract for breaking the rules. Mother was discharged from KIVA on October 22, 2021 due to threatening physical harm to another resident and the program manager. The program manager offered to assist Mother with transferring to the Family Recovery Center but Mother refused. Mother enrolled in Parent Care Central on December 13, 2021, where she would receive treatment and support services for her substance abuse issues. As of the date of the Agency's report, Mother was on a program support agreement there due to testing positive for alcohol in December 2021. The Agency stated Mother had not addressed her substance history and how it affects her ability to be a safe parent. It reported that Mother had not demonstrated a period of sobriety or provided a relapse prevention plan.

In its March 23, 2022 addendum report, the Agency reported that Mother left Parent Care Central on February 11, 2022 due to testing positive for alcohol a second time, which Mother believed was a false positive. Mother was now living at the San Diego Rescue Mission (Rescue Mission), where she received case management, individual and group counseling for substance abuse, and mental health services. However, the Agency indicated that the Rescue Mission is not the same as attending a substance treatment program. Mother informed the Agency that she wanted to enroll into the McAlister program but had not provided confirmation of enrollment. The Agency reported that Mother tested negative on January 19, 2022 and February 21, 2022. Nonetheless, the Agency noted that Mother's progress in substance treatment declined, and McAllister would be Mother's third substance treatment program. The Agency reported that in order for Mother's visitation to progress, she needs to consistently engage in substance treatment, comply with a treatment program, work on a relapse prevention plan, and demonstrate an understanding of how substance use affects her ability to provide safety to her children. At the March 23, 2022 hearing, Mother's counsel informed the court that Mother was scheduled to start McAlister the following Monday.

In its May 5, 2022 addendum report, the Agency reported that on May 2, 2022, Mother indicated she was no longer residing at the Rescue Mission due to her time elapsing. She was currently residing in temporary housing at a motel. Since the last hearing, Mother had enrolled in the McAlister substance abuse treatment program. According to a report from McAlister, Mother enrolled in outpatient services on March 21, 2022 with a start date of March 24, 2022. Since then, she had completed 13 out of 25 groups including 10 excused absences and two unexcused absences, making "her progress to

6

date 50% and Unsatisfactory." Mother was drug screened and tested negative on March 21, 2022, March 25, 2022, March 29, 2022, April 5, 2022, and April 12, 2022. The Agency's current risk assessment if the children were placed back with Mother remained high because the issues that caused the children's removal had not been addressed. The Agency indicated Mother continued to lack insight needed to create a safety plan to ensure the safety of the children. The Agency was hopeful Mother would continue to engage and progress in her treatment to ensure she continues to have positive and safe interactions with the children to progress toward reunification when appropriate.

At the six-month review hearing, the court accepted into evidence the January 31, 2022, March 23, 2022, and May 5, 2022 reports. The court also accepted into evidence test results from a hair follicle test showing Mother tested negative on March 14, 2022.

Mother testified she had been at McAlister since March 21, 2022. Mother acknowledged that McAlister reported her participation was at 50 percent and testified that it was due to issues with transportation. She acknowledged she was discharged from Parent Care Central prior to McAllister due to using alcohol. However, she disputed that decision, and claimed that she did not use alcohol and was "clean" since giving birth to the children in April 2021.

When asked why the children were removed from her custody, Mother testified that it was because "they said I tested dirty at birth, and then they went to test meconium and said that it was . . . dirty too." When asked whether she was using drugs when she was pregnant, Mother testified "No." She testified that she disputed that the meconium was positive and she disputed that she tested positive for methamphetamine and amphetamines.

7

Mother testified that she did not know the date that she last used methamphetamine but testified that she did not use in 2021 or 2022. When asked why she thinks she tested positive for methamphetamine when the children were born, Mother testified "That I don't know. . . . That one I definitely am disputing. But I can give you a date on the last time I used—I can just be honest and tell you that before I was pregnant, you know, I was in a situation and I wasn't planning to be pregnant; but I ended up stopping everything when I got pregnant. So, honestly, with that being said, I did have a relapse, three months."

The Agency argued that the protective issue outlined in the petition was Mother's substance abuse, and:

> "The progress that the Mother has made is really lackluster in this case, particularly the insight that the Mother has to what the original protective issues were. There was—the minor tested positive at birth for methamphetamine and amphetamines; the mother, buprenorphine. The mother also around the time of birth tested positive, and that was found true by the court. Here we are 12 months into the case and the mother continues to not understand the original protective issues in the case. She is about fifty percent participation in her drug treatment program, and she is really not getting the insight out of the drug treatment program that we should expect for someone to go forward and continue to be sober and to be able to parent these children for the next 18 years given that the mother has really been in denial about her own use that's been true—found by this court. . . . The Agency wants to continue to work with her. I think that she definitely will be able to reunify with these children given more reunification services. However, at this time given where she is and her participation particularly in her drug treatment program, and the stability of her housing, we would ask the court to continue with

8

unsupervised visitation with the Mother and to give the Agency discretion to expand to overnight visitation."

Mother's counsel argued:

"In regard to substance abuse, her attendance is not perfect, but she has been consistently attending treatment throughout this case. There was a disagreement as to the alcohol—the swab that parent care said was positive for alcohol. The Mother obtained a hair follicle test through my office which has been submitted to the court demonstrating her sobriety. It does include the ethylene for alcohol. The Mother enrolled in a new program and is diligently working on it. Her attendance is down 50 percent, but notably she is testing for them. The list of actual tests in this letter is quite significant. She is obviously there pretty regularly and able to test randomly and is testing negatively for them. ¶ So I don't think—so the Mother, again is willing to continue in a family maintenance program doing the services, gaining additional insight; but right now she is clean and sober and could provide safe care for her children. So we would ask, again, that the court find there is no detriment on that issue."

In making its ruling, the court stated:

"[T]he first question the court has to address is the question of return of the child to physical custody. The standard for this at this hearing is the court has to determine whether they can find by a preponderance of the evidence that return of the children would create a substantial risk of detriment. To be clear, that's a very low standard. Preponderance of the evidence is not like in a criminal case, beyond a reasonable doubt. It is more likely than not. With that, I do find that return of the children today would create a substantial risk of detriment.

¶

"I'm not focusing on the housing issue. I'm not. Housing, I believe, you have that under control. I believe you're

9

working on that and I believe you are. I believe you're working on everything else too. I believe that you're doing the best you can, and I think it is really a terrible situation that you didn't receive the referral and you tried and it didn't happen for the domestic violence.

¶

"What concerns me is—I think I just have to clarify kind of where we are. So back on August 3rd, 2021, it wasn't me sitting here. It was another judge. That judge found true by clear and convincing evidence the allegations in the petition with respect to the children, that the children were in danger because they were born with substances in their system. The judge found true that there was substance abuse issues. So it is a difficult position because on the one hand, I know you are trying to address the issues. On the other hand, I have you denying the science that we have here, the tests that we have that show that's what happened. And that's what leaves the court with a feeling that we're making progress, definitely. I definitely see that. But there is still a risk of detriment because if we don't acknowledge the reality of how the children were born and the circumstances they were born under, we can't move forward making sure they are completely safe. So with that, the court is not going to return the children today."

The court continued the children as dependents, continued placement of the children in foster care, and set a 12-month review hearing date.

DISCUSSION

Mother argues the court misunderstood section 366.21, subdivision (e)(1) and erred in continuing the children's foster care placement based on the court's statement that they would not be "completely safe" in Mother's custody. Alternatively, Mother argues substantial evidence does not support the court's order continuing the children's placement in foster care. We disagree. The juvenile court properly applied section 366.21, subdivision

10

(e)(1) and substantial evidence supports the juvenile court's detriment finding.

Mother also argues the requirements under ICWA were not satisfied. The Agency concedes this issue. We agree and conditionally reverse, remanding for the limited purpose of ICWA compliance.

## A. Return to Mother's Custody

Mother argues the juvenile court misconstrued section 366.21, subdivision (e)(1) and erroneously continued the children's foster care placement because the court believed the children would not be "completely safe" if returned to Mother's custody. Mother argues the standard for "substantial risk of detriment" is not met solely because a child's safety cannot be guaranteed. Alternatively, Mother argues substantial evidence does not support the court's detriment finding. Specifically, Mother argues the trial court continued the children's foster care placement because the court believed Mother denied the protective issues that led to their removal. Mother contends substantial evidence does not support this finding. Mother also argues that she can continue to deny the protective issues and still resume custody of the children.

We review the finding of detriment for substantial evidence. (*V.C. v. Superior Court* (2010) 188 Cal.App.4th 521, 529.) Under this standard of review, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 (*In re L.Y.L.*).) The appellant challenging the detriment finding bears the burden on appeal to show there is insufficient

11

evidence to support the court's findings and orders. (*Id.* at p. 947; *In re D.M.* (2012) 205 Cal.App.4th 283, 291.)

"The purpose of the California dependency system is to protect children from harm and to preserve families when safe for the child. (§ 300.2; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) The focus during the reunification period is to preserve the family whenever possible. [Citation.] Until services are terminated, family reunification is the goal and the parent is entitled to every presumption in favor of returning the child to parental custody. (§§ 366.21, 366.22; [citation].)" (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424 (*Tracy J.*).)

At the six-month review hearing, the court is required to return a child to parent's care "unless the Agency proves, by a preponderance of the evidence, that return would create a substantial risk of detriment to the child's physical or emotional well-being. (§ 366.21, subd. (e).)" (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483 (*Mary B.*).) "In reviewing whether the record contains substantial evidence that returning [the child] to [the parent's] custody would have been detrimental to [the child], we must keep in mind that the purpose of the reunification plan is 'to overcome the problem that led to removal in the first place.' " (*Id.* at p. 1483) Viewing the evidence in the light most favorable to the juvenile court's ruling, as we must, we conclude the court properly found that returning the children to Mother's physical custody would create a substantial risk of detriment.

The court made its detriment finding based on Mother's substance abuse issues that led to the children's removal. The record shows that both the Agency and the court were concerned that Mother had not adequately addressed her substance abuse issues such that she no longer posed a substantial risk to the children's physical or emotional well-being.

12

Specifically, the court was concerned that Mother had not acknowledged the reality that the children were born with substances in their system and that she herself tested positive at the time of the children's birth. Mother argues substantial evidence does not support this finding. We disagree.

Mother herself testified at the six-month review hearing that she was not using drugs when she was pregnant, although she appears to have contradicted herself when she testified that "I ended up stopping everything when I got pregnant. So, honestly, with that being said, I did have a relapse, three months." She also disputed that the meconium was positive and that she herself tested positive for methamphetamine and amphetamine. This was all contrary to the test results, the allegations in the petitions that the court previously found to be true, and Mother's previous admissions as noted in the Agency's reports. Based on Mother's testimony, the court could reasonably find that Mother was in denial of her substance abuse issues and had not acknowledged the safety concerns that led to the children's removal. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947 [under the substantial evidence standard of review, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings].)

Alternatively, Mother argues her disagreements with the details in the petition and the Agency's reports cannot support a detriment finding. Mother contends that a "parent may continue to deny the specific protective issues in the case and still resume custody of the child as long as the parent has adequately modified their behavior." She cites two cases to support her claim, *Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856 (*Georgeanne G.*) and *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 (*Blanca P.*), but neither case demonstrates that the court erred in this case.

13

In *Georgeanne G.*, the court *rejected* the parent's claim that "lack of insight is not a valid ground for finding [the child's] return to [the parent's] home would create a substantial risk of detriment to [the child's] safety or physical or emotional well-being." (*Georgeanne G.*, at p. 865.) After discussing several cases, including *Blanca P.*, the court concluded that "[n]one of these cases holds a parent's lack of insight may not be considered by the juvenile court," so long as the evaluation of the parent's insight is " 'based on *evidence* rather than an emotional response.' " (*Georgeanne G.*, at p. 867, citing *Blanca P.*, at p. 1750.)

Here, Mother's testimony denying that she and the children tested positive for methamphetamine and amphetamine is *evidence* that Mother lacked insight to the protective issues and risk of harm created by Mother's substance use. The court could reasonably conclude that due to Mother's denial and lack of insight, returning the children to Mother's custody would create a substantial risk of detriment to the children's physical or emotional well-being. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].) In doing so, the court properly applied section 366.21, subdivision (e)(1). The court's statement that "there is still a risk of detriment because if we don't acknowledge the reality of how the children were born and the circumstances they were born under, we can't move forward making sure they are completely safe," does not establish that the court applied the wrong standard for a detriment finding or that the court was requiring complete safety in order to return the children to Mother at the six-month review hearing. Rather, the court expressed the importance of

14

Mother acknowledging and gaining insight into the safety issues that led to the children's removal.

Mother's lack of progress and participation in her substance abuse treatment programs also serve as substantial evidence to support the court's detriment finding. Mother began treatment at KIVA in September 2021, four months after petitions were filed, and was discharged the following month, October 2021 due to threatening physical harm to another resident and the program manager. Mother enrolled in Parent Care Central two months later, on December 13, 2021, and left two months later on February 11, 2022, for testing positive for alcohol for a second time. While Mother disputes the positive alcohol test result, the important relevant fact is that Mother was only in treatment at Parent Care Central for two months. She then enrolled in McAlister more than a month later, on March 21, 2022. As of April 26, 2022, Mother had attended 13 out of 25 groups. The majority of the absences were excused and Mother testified that she had transportation issues, however, the reality is that Mother had started treatment at McAlister less than two months before the six-month review hearing, and Mother had only participated in half of her treatment groups, which according to McAlister is unsatisfactory.

Based on the above evidence, the court could reasonably find that as of the time of the six-month review hearing on May 5, 2022, Mother had not yet sufficiently addressed the substance abuse issues that led to the children's dependency. Substantial evidence therefore supports the court's finding that return of the children to Mother's custody would create a substantial risk of detriment.

Mother points to evidence supporting the return of her children to her custody, such as her consistent negative drug tests, her engagement with

three separate treatment centers, and the court's acknowledgement that Mother was "making progress." However, even if we accept that some evidence supports Mother's position, our role on appeal is not to consider whether sufficient evidence would have supported the opposite finding. Under the substantial evidence standard of review, "we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947.)

Mother also contends any concerns regarding her substance abuse could have been mitigated with ongoing supervision by the Agency and the court through a family maintenance plan rather than continuing under a reunification plan. Specifically, Mother contends the social worker could have conducted unannounced home visits. Mother cites no evidence or authority for her argument that unannounced visits was a viable alternative to continued removal that would address the risks and circumstances in this case. (Compare with *In re Henry V.* (2004) 119 Cal.App.4th 522, 529–531 [reversing removal order where child was removed for single, serious incident of physical abuse; social worker testified about in-home services that could mitigate risk of further physical abuse, including unannounced visits, public health nursing services, and in-home counseling, and mother was "fully cooperative"].) Supervision under a family maintenance plan and unannounced home visits would not address or resolve Mother's failure to fully participate in her substance abuse treatment or Mother's failure to acknowledge her substance abuse issues that led to the children's removal. (*Mary B.*, *supra*, 218 Cal.App.4th at p. 1483 ["In reviewing whether the record contains substantial evidence that returning [the child] to [the

16

parent's] custody would have been detrimental to [the child], we must keep in mind that the purpose of the reunification plan is 'to overcome the problem that led to removal in the first place' "].)

## B. ICWA

Mother argues ICWA was not satisfied. Specifically, Mother argues the information Father provided regarding potential Indian ancestry in his family triggered the Agency's duty of further inquiry, which was not satisfied. Similarly, Mother argues the Agency did not fulfill its further inquiry obligations regarding potential Indian ancestry from her side of the family. Mother also argues the Agency did not satisfy its initial inquiry duties because it failed to conduct an ICWA inquiry of available extended family members. As the Agency concedes, we conclude the Agency failed to comply with its inquiry obligations under ICWA and substantial evidence therefore does not support the court's ICWA finding. As such, we conditionally reverse the juvenile court's order and remand for the limited purpose of ensuring ICWA compliance.

### 1. Additional Facts

In the petitions, the Agency stated that it asked Mother and Father about the children's Indian status and both Mother and Father gave no reason to believe the children are or may be Indian children.

In its detention report, the Agency reported that Mother denied any Indian ancestry on April 20, 2021, and Father denied any Indian ancestry on May 4, 2021. The Agency reported interviewing maternal aunt J.O. and maternal grandmother, but did not indicate asking them about the children's potential Indian ancestry. Mother also identified maternal uncle S.O., who resides in Oklahoma, as someone to be considered for placement.

17

In its detention order, the court found that Mother claimed possible Indian ancestry and deferred the ICWA issue.[3]

In its May 27, 2021 jurisdiction and disposition report, Mother identified maternal uncle D.O., who resides in Virginia as someone to be considered for placement. Mother also stated there was another maternal uncle who lived in Los Angeles, however, she is "not in touch with him as much."

In its July 27, 2021 addendum report, the Agency reported that on June 1, 2021, Mother claimed that she has Cherokee ancestry from her mom's grandmother (maternal great-great-grandmother), E.H., who was deceased. Mother stated maternal grandmother had more information. Maternal grandmother said Mother is "out of her mind. She is not Cherokee. She does not know what she's talking about." Maternal grandmother informed the Agency that her family is from Oklahoma and her father who is deceased said they are Creek and Choctaw. Maternal grandmother stated she would message "some relatives" for more information.

The agency mailed letters to Thlopthlocco Tribal Town, Poarch Band of Creek Indians, The Muscogee (Creek) Nation, Mississippi Band of Choctaw Indians, Kialegee Tribal Town, Jena Band of Choctaw Indians, The Choctaw Nation of Oklahoma, and Mississippi Band of Choctaw Indians. However, the letters did not include maternal great-great-grandmother E.H.'s name. The Agency received a return letter from Choctaw Nation of Oklahoma and Poarch Band of Creek Indians indicating that the family was not found in their database.

---

[3] The reporter's transcript for this hearing is not included in the record. This does impact our analysis because subsequent reports show that Mother claimed possible Indian ancestry.

At the pretrial conference on July 27, 2021, the Agency reminded the court that ICWA remained pending. The court continued to defer an ICWA finding.

At the contested adjudication and disposition hearing on August 3, 2021, Father denied Indian ancestry. The court found that "[b]ased on the position of the Mother, as previously represented and also now from the Father, the court will find, at this time, that ICWA does not apply."

At a March 23, 2022 hearing, the court conducted an ICWA inquiry of Mother, who informed the court that she had Indian ancestry through her deceased great-grandmother who was mixed with Cherokee and "another tribe," which she did not know how to pronounce or spell. The Agency informed the court that it sent letters to tribes, as shown in the July 27, 2021 addendum report. In response, the court stated that "inquiry has been done" with respect to Mother's side of the family and "I think we're good." The court then conducted an ICWA inquiry of Father, who claimed for the first time Blackfoot, and Chiricahua or Chihuahua ancestry. When asked if he had family members who would have more information, Father stated "cousin or brother or auntie." The court instructed the Agency to reach out to Father for more information.

The Agency did not provide any further information regarding the Agency's ICWA inquiry efforts in its subsequent May 5, 2022 report.

ICWA was not discussed at the May 5, 2022 six-month review hearing. In its written order, the court found that ICWA notice was not required because the court had reason to know the children are not Indian children and reasonable inquiry had been made to determine whether the children are or may be Indian children.

2. Applicable Law

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement with non-Indian families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) Under California law adopted pursuant to ICWA, the juvenile court and Agency have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.*, at p. 9.) An "Indian child" is defined in the same manner as under federal law, i.e., as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" (25 U.S.C. § 1903(4); accord Welf. & Inst. Code, § 224.1, subd. (a) [adopting the federal definition].)

As outlined by this court in *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*In re D.S.*), "section 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply."

During the first stage of initial inquiry, "[s]ection 224.2, subdivision (b) specifies that once a child is placed into the temporary custody of a county welfare department, such as the Agency, the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian,

extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' " (*In re D.S.*, *supra*, 46 Cal.App.5th at pp. 1048–1049.)

ICWA defines " 'extended family member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [" 'extended family member' . . . defined as provided in [§] 1903" of ICWA].)

After a "reason to believe" that an Indian child is involved has been established, further inquiry regarding the possible Indian status of the child is required. (§ 224.2, subd. (e).) The duty of further inquiry includes (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership; and (3) contacting tribes and anyone else that might have information regarding the child's membership or eligibility in a tribe. (*Id.*, subd. (e)(2).)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence." (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051.) However, where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. (*Ibid.*)

3. Analysis

Here, the Agency concedes that it did not, and should have: (1) interviewed all available extended family members about the children's potential Indian ancestry; (2) followed up with maternal grandmother about relatives who may have information about the children's potential Choctaw

21

or Creek heritage; (3) followed up with Mother regarding what "other tribe" from which she believed she might have Indian ancestry; (4) included maternal great-great-grandmother E.H.'s name in its inquiry letters to the tribes and sent inquiry letters to the Cherokee tribes; (5) followed up on Father's statements regarding relatives who may have more information about his potential Blackfeet or Chiricahua ancestry; and (6) contacted the Bureau of Indian Affairs and the California Department of Social Services for assistance in identifying tribes from which the maternal relatives in Oklahoma might have Indian ancestry.

Based on our review of the record, we agree that the Agency failed to satisfy its initial inquiry and further inquiry obligations. The Agency had contact with but did not conduct an ICWA inquiry of maternal aunt J.O. Mother also identified maternal uncle D.O. in Virginia, maternal uncle S.O. in Oklahoma, and another maternal uncle in Los Angeles. To the extent the Agency was in contact with or has contact information for these individuals, the Agency should interview them about the children's potential Indian ancestry. The Agency also failed to satisfy its further inquiry obligations regarding Mother's claim of potential Indian ancestry, including following up with Mother and maternal grandmother regarding relatives who would have further information, stating maternal great-great-grandmother E.H.'s name in the inquiry letters, and sending inquiry letters to Cherokee tribes. Likewise, the record does not show that the Agency conducted *any* further inquiry regarding Father's claim of potential Indian ancestry, including following up with Father regarding relatives who would have further information, and sending inquiry letters to the tribes that Father identified. The Agency should also contact the Bureau of Indian Affairs and the California Department of Social Services for assistance in identifying tribes

22

from which the children might have Indian ancestry.  We accept the Agency's concession that a limited remand is appropriate.  As such, we conditionally reverse and remand for the limited purpose of ensuring compliance with ICWA.

Given the importance of expediency and need for finality, we encourage the parties to stipulate to immediate issuance of the remittitur in this case. (Cal. Rules of Court, rule 8.272(c)(1).)

## DISPOSITION

The orders issued at the May 5, 2022, contested section 366.21 hearing are conditionally reversed and the matter is remanded to the juvenile court with directions that within 30 days of the remittitur the Agency must file a report demonstrating its compliance with the inquiry provisions of ICWA. Within 45 days of the remittitur, the juvenile court must conduct a hearing to determine if the Agency's investigation satisfied its affirmative duty to investigate.  The juvenile court has the discretion to adjust these time periods on a showing of good cause.

If after investigation neither the Agency nor the juvenile court has reason to believe or to know M.O. and T.O. are Indian children, the May 5, 2022 order shall be reinstated. Alternatively, if after completing the inquiry, the Agency or the juvenile court has reason to believe or to know M.O. and T.O. are Indian children, the juvenile court shall proceed in conformity with ICWA and related California law.

O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.